IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Linda D. White,<br>                Plaintiff,<br>vs.<br>Michael J. Astrue,<br>Commissioner of Social Security,<br>                Defendant. | Civil Action No. 6:10-462-JFA-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on April 20, 2007, alleging that she became unable to work on September 23, 2006. The application was denied initially and on reconsideration by the Social Security Administration. On October 23, 2007, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her attorney, and a vocational expert appeared on April 22, 2009,

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on June 15, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on January 4, 2010. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant met the disability insured status requirements of the Act on September 23, 2006, the alleged date of disability onset, and continues to meet them through the date of this decision.
>
> (2)     The claimant has not engaged in substantial gainful activity since the alleged date of disability onset.
>
> (3)     The medical evidence establishes that the claimant has "severe" arthritis and vertiginous syndrome of certain etiology, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4. Additionally, for the reasons discussed in the body of this decision the claimant has not met her burden of establishing that she has any other "severe" impairment.
>
> (4)     For the reasons discussed in the body of this decision, the testimony regarding the severity of the claimant's impairments and resulting functional limitations was not persuasive.
>
> (5)     The claimant retains the residual functional capacity to perform "medium" work subject to the additional limitations discussed in the body of this decision.
>
> (6)     The claimant is unable to perform her past relevant work.
>
> (7)     The claimant is a "younger individual" and she has a high school education.
>
> (8)     Based on an exertional capacity for "medium" work, and the claimant's age, education, and work experience, section 404.1569 and Rule 203.29, Table No.3, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

2

>(9) Even if the claimant's non-exertional limitations do not allow her to perform the full range of "medium" work, using the above cited Rule in conjunction with the credible testimony of the vocational expert, a finding that there are a significant number of jobs in the national economy which the claimant could perform is warranted. Examples of such jobs are laundry worker II and packer.
>
>(10) The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision 20 CFR 404.1520(f).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

>the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing

substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

4

> preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The record reveals that the plaintiff was born May 22, 1963, was 43 years of age on her alleged onset date and 46 years of age on the date of the ALJ's decision (Tr. 121). The plaintiff reported that she has a 12th-grade education and past work as an assembler, an auditor, a cycle counter and a packer (Tr. 128, 141, 146).

### *Medical Evidence*

Treatment Notes

Beginning in September 2006, the plaintiff was treated by James Wilson, M.D., a rheumatologist, with complaints of muscle and joint pain as well as vertigo and stiffness. Dr. Wilson concluded that the plaintiff probably had inflammatory arthritis and prescribed medication (Tr. 237-38). In November 2006, the plaintiff reported that the medication was very helpful and that she had decreased joint swelling and pain (Tr. 236). In February 2007, the plaintiff continued to report that the medication was "very helpful," that her pain was "much improved," that she was doing "much better" and that she had no medication side effects (Tr. 235).

X-rays of the plaintiff's hands and feet revealed no abnormalities in her hands or right foot, and only minimal degeneration of her left first MP joint (Tr. 239-40).

In May 2007, when the plaintiff next returned to Dr. Wilson, she reported multiple diffuse complaints and only mild benefit from use of medication. Dr. Wilson, however, observed that blood tests were negative for any form of inflammatory arthritis and that her x-rays did not reveal any disease process. He noted that she "is quite unhappy that her disability claims are being turned down at this point." He commented that the plaintiff could not "even tolerate the feeling of the BP cuff on her arm," that she "refuses open MRI without sedation," and expressed some frustration with his patient: "I am close to being done here" (Tr. 284).

There is no indication that the plaintiff returned to Dr. Wilson until March 27, 2008. On that date, Dr. Wilson's records show that he opined that the plaintiff's objective tests continued to be negative (Tr. 368).

Other medical records show that, beginning in September 2006, the plaintiff was treated by Luna Bailey, M.D., an otolaryngologist, with complaints of intermittent and unpredictable vertigo with occasional nausea. Testing showed that the plaintiff had mild bilateral hearing loss (Tr. 216-17). Dr. Bailey's records also show that an ENG revealed a degree of left labyrinthine dysfunction with evidence of oscillopsia (a visual disturbance in which objects appear to oscillate). Dr. Bailey recommended that the plaintiff undergo vestibular therapy (Tr. 219). In November 2006, the plaintiff reported that she had not undergone the therapy because she was not able to drive to the facility offering the therapy (Tr. 221). Dr. Bailey's records also show that an MRI of the plaintiff's temporal bones was normal (Tr. 225). Dr. Bailey's records show that the plaintiff last returned to her practice in April 2007, when the plaintiff reported continuing vertigo of such severity that she was unable to walk without a walker (Tr. 265).

In January and February 2007, Dr. Bailey referred the plaintiff to Steven Gold, M.D., an otolaryngologist, for evaluation of ongoing episodic vertigo with chronic imbalance. The plaintiff complained of episodic vertigo, with minor ongoing symptoms that waxed and waned and one severe spell a month. Dr. Gold's initial examination revealed no abnormalities. His plan of treatment included a trial of medication. ENG results were clinically unremarkable. Subsequently, the plaintiff reported no improvement with medication (Tr. 227-31).

During a Computerized Dynamic Posturography test, the plaintiff performed significantly more poorly than expected and fell on the easiest part of the test. Dr. Gold opined that the plaintiff's performance indicated that she had either a catastrophic neurological disorder or that there was a high probability that her test performance and subjective symptoms were non-organic in origin. Dr. Gold further opined that there was "minimal evidence" that the plaintiff had peripheral vestibulopathy, that her reported imbalance was of unclear etiology, and that her clinical picture was "confusing." Additionally, he opined that the plaintiff's raw test data supported a conclusion that her symptoms were of non-organic origin, that the accuracy of her test results was questionable due to her behavior, and that her test results indicated either conscious malingering for secondary gain or a subconscious conversion disorder. He also opined that he could not rule out the possibility that the plaintiff was exaggerating an underlying vestibular problem, and he recommended that she undergo vestibular therapy (Tr. 232-33).

In February 2007, Howard Mandell, M.D., a neurologist, began treating the plaintiff. The plaintiff reported that she was dissatisfied with Dr. Gold and that she had symptoms including a sense of fullness in her ears, tinnitus and an inability to walk. A neurological examination was normal, and Dr. Mandell opined that there was no objective evidence that the plaintiff had Meniere's disease. The next month, Dr. Mandell noted that an MRI of the plaintiff's brain was normal ( 260-63). In March 2007, the plaintiff began a

course of vestibular therapy, but she stopped therapy after five visits because she said it was making her symptoms worse (Tr. 242).

In May 2007, Dr. Mandell opined that the plaintiff had a very peculiar gait. The plaintiff told Dr. Mandell that she continued to have symptoms including impaired balance, ringing in her ears, vertigo and falling spells. The plaintiff reported that her symptoms continued. Dr. Mandell opined that the plaintiff had not responded to any treatment and that she was "not able to work and really is disabled" (Tr. 326-27).

In June 2007, Dr. Mandell opined that the plaintiff had no functional limitations related to depression or anxiety (Tr. 302). In July 2007, he opined that the plaintiff's continuing symptoms were of unknown etiology (Tr. 324). Finally, in September 2007, when he last treated the plaintiff, Dr. Mandell reported that she was using a walker due to continued subjective reports of dizziness. A neurological examination revealed no central cause for her symptoms. Nevertheless, Dr. Mandell opined that the plaintiff was "clearly debilitated" by her symptoms, and he wondered if her symptoms could stem from diabetes (Tr. 323).

In May 2007, the plaintiff underwent a posturography study at Wake Forest Baptist Medical Center in Winston Salem, NC (Wake). Her test results were "markedly abnormal," suggestive of either severe multisystem dysfunction, or poor compliance with testing, or possible medication side effects (Tr. 319, 321).

On August 14, 2007, the plaintiff was examined by John May, M.D., an otolaryngologist and Associate Professor of Otolaryngology at Wake. The plaintiff said that she had vertigo two or three times a week, that after attacks of vertigo she slept for 12 to 14 hours, that she was dizzy when she bent over, and that she had some visual disturbances including double vision and seeing a white spot. Dr. May opined that the plaintiff's studies did not suggest a vestibular origin for her alleged symptoms and that her vestibular system was not playing a significant role in her condition. He further opined that

he did not believe that the plaintiff had Meniere's disease. Additionally, Dr. May reported that on examination the plaintiff said that she was dizzy when asked to assume different positions, but he opined that he found no evidence of abnormal eye movement that would be expected with actual dizziness. Dr. May also reported that when he asked the plaintiff to stand and walk, she trembled, had severe ataxia, and had to sit down. Dr. May opined that the plaintiff's reaction to standing "appears to be extremely exaggerated to me," and concluded that he had nothing further to offer the plaintiff (Tr. 319-21).

State Agency Physician Opinions

In May 2007, Robert Kukla, M.D., a State agency physician, reviewed the plaintiff's medical records and assessed her residual functional capacity. Dr. Kukla thought the plaintiff could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour workday; stand or walk about six hours in an eight-hour workday; never climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. In addition, he thought she needed to avoid even moderate exposure to hazards. In formulating the residual functional capacity, Dr. Kukla noted that the plaintiff reported she had Meniere's disease, musculoskeletal pain, and mild hearing loss (Tr. 285-92).

Six months later, Darla Mullaney, M.D., a State agency physician, reviewed the plaintiff's medical records and assessed her residual functional capacity. Dr. Mullaney thought the plaintiff could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour workday; stand or walk about six hours in an eight-hour workday; never climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. In addition, she thought the plaintiff needed to avoid concentrated exposure to noise and even moderate exposure to

hazards. Dr. Mullaney noted that the plaintiff's symptoms seemed disproportionate to the clinical findings (Tr. 328-35).

***Plaintiff's Statements and Administrative Hearing Testimony***

In her initial disability report, the plaintiff complained primarily of vertigo and the limitations it caused (Tr. 140). She also complained of pain throughout her body and swelling in her hands that caused diminished grip strength (Tr. 140). She claimed that she had to stop working due to vertigo attacks (Tr. 140). The plaintiff also completed a function report, again complaining mainly of limitations caused by vertigo (Tr. 152-59). In subsequent disability reports, the plaintiff complained mostly of limitations caused by vertigo and claimed that she had trouble lifting and carrying small items due to diminished grip strength, loss of balance, and foot pain (Tr. 165, 173). She also claimed she had difficulty with manipulating buttons and zippers and putting on socks and shoes due to swelling in her hands and diminished grip strength (Tr. 169, 178, 188).

At the April 22, 2009 hearing, the plaintiff testified that she was married and had one child at home (Tr. 13). She said that she had completed the 12th grade (Tr. 13). She said that her past work included jobs as a packer, assembler, cycle counter, and auditor (Tr. 13-18).

The plaintiff testified that she began having vertigo attacks in June 2006 (Tr. 19). She said that the vertigo made her dizzy and caused her to lose her balance and fall (Tr. 20-21). She said she had between one and four attacks per week (Tr. 20). She said the attacks lasted 10 minutes to eight hours, and six hours on average (Tr. 22). She said she continued to have balance problems after the attacks ended (Tr. 22). She had a driver's license, but said she did not drive (Tr. 24). She said she had headaches associated with the attacks (Tr. 26).

The plaintiff testified that she spent most of her day sitting or lying down and watching television (Tr. 25-26). She said she occasionally went grocery shopping but rarely left her house because she was scared to fall in public (Tr. 25). She said her husband and son cooked and that she did not exercise (Tr. 26).

*Vocational Expert Testimony*

Jeanette Clifford, a vocational expert, also testified at the hearing. The ALJ asked Ms. Clifford to identify any of her testimony that differed from the *Dictionary of Occupational Titles* (*DOT*) (Tr. 28). Ms. Clifford testified that the plaintiff's past work was as a packer (medium, unskilled), a machine hasher (medium, unskilled), an inventory auditor (medium, semi-skilled), a cycle-counter (light, semi-skilled), an inventory/receiving clerk (medium, semi-skilled), and forklift operator (medium, semi-skilled) (Tr. 28-30). The ALJ asked Ms. Clifford to consider a person of the plaintiff's age (47), with a 12th-grade education, and with the same residual functional capacity he ultimately found the plaintiff had (Tr. 30). Ms. Clifford testified that the person could not perform the plaintiff's past work (Tr. 30).[2] Ms. Clifford then testified that the hypothetical person could perform the medium, unskilled jobs of laundry worker II (*DOT* code 361.685-018) (4,009 jobs in the South Carolina economy) and packer (1,664 jobs in the South Carolina economy) (Tr. 30-31).[3] Ms. Clifford said that the person could also perform light and sedentary jobs, but did not identify any of those jobs (Tr. 31).

---

[2]Ms. Clifford's testimony on this point is inaudible (Tr. 30). However, the ALJ noted that she testified that the hypothetical person would not be able to perform the plaintiff's past work (Tr. 48).

[3]Ms. Clifford identified the *DOT* code for packer as 920.685-134 (Tr. 31). This code is not in the *DOT*. The closest medium, unskilled job identified by the *DOT* is packer, agriculture, *DOT* code 920.687-134.

11

## **ANALYSIS**

The plaintiff alleges disability commencing September 23, 2006, due to limitations caused by Meniere's disease (a disorder of the inner ear that can affect hearing and balance), vertigo, and arthritis. The plaintiff was 43 years old on her alleged onset date. She completed high school and has past relevant work experience as an assembler, auditor, cycle counter, and a hand packer. The ALJ determined that the plaintiff had the following severe impairments: arthritis and vertiginous syndrome of uncertain etiology. The ALJ found that the plaintiff had the residual functional capacity ("RFC") to perform a reduced range of medium work, including limitations that she not be required to climb, balance, or crawl on more than an occasional basis and that she not be around dangerous machinery or unprotected heights (Tr. 48). The ALJ determined that the plaintiff was unable to perform any past relevant work, but she could perform such jobs as laundry worker II and packer. The plaintiff argues that the ALJ's decision is not supported by substantial evidence and the ALJ erred by: (1) improperly evaluating her RFC; and (2) failing to resolve conflicts between the vocational expert's testimony and the *DOT*.

*Residual Functional Capacity*

The plaintiff argues that the ALJ improperly evaluated her RFC. The ALJ reasonably found inconsistencies in the record that undermined the plaintiff's credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment

> reasonably likely to cause the pain claimed, that the intensity
> and persistence of the claimant's pain, and the extent to which
> it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1) the individual's daily activities;
>
> (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3) factors that precipitate and aggravate the symptoms;
>
> (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

13

> (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ concluded that while the plaintiff's impairments could "at least theoretically" be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible in view of the inconsistencies in the record (Tr. 45). The ALJ noted that while the medical evidence showed that the plaintiff complained about dizziness, her physicians stated that the objective medical evidence did not show that she had an impairment responsible for her alleged vertigo (Tr. 45). Indeed, Dr. Wilson and Dr. May could find no impairment that would have caused her vertigo (Tr. 284, 321). In addition, the ALJ noted that there was evidence that the plaintiff had exaggerated or out-of-the-ordinary responses to testing and that her physicians questioned the validity of her complaints (Tr. 45). For example, Dr. Gold opined that the plaintiff was either malingering or that she had a subconscious conversion disorder (Tr. 232-33). However, as the ALJ stated in his decision, there was no evidence of a conversion disorder in the record (Tr. 45). In addition, Dr. May noted the plaintiff's reaction to being asked to stand was "extremely exaggerated" (Tr. 321).

With respect to the plaintiff's arthritis, the ALJ found similar inconsistencies (Tr. 46). For example, Dr. Wilson's records showed significant improvement in the plaintiff's pain and other symptoms with medications (Tr. 235-36). Further undermining the plaintiff's credibility, the ALJ noted that there was no evidence that the plaintiff sought treatment for pain at a hospital emergency room or urgent care facility or that Dr. Wilson referred her to another specialist for different or more aggressive treatment (Tr. 46). The ALJ also noted the that the plaintiff did not seek any treatment after October 2007 (Tr. 46).

In determining the plaintiff's RFC, the ALJ also considered Dr. Mandell's opinion that the plaintiff was disabled, but gave it little weight (Tr. 47; *see* Tr. 323). The

regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the Listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p, 1996 WL 374188, requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. *Id.* at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

Dr. Mandell had noted in September 2007 that the plaintiff used a walker due to complaints of dizziness, but a neurological examination revealed no central cause for her

symptoms (Tr. 323). He opined that the plaintiff was "clearly debilitated" by her symptoms (Tr. 323). However, as the ALJ inferred, Dr. Mandell relied on the plaintiff's subjective complaints (Tr. 47). As argued by the Commissioner, this was a good reason for giving little weight to Dr. Mandell's opinion. *See, e.g., Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (finding that a physician's opinion that was based on the claimant's subjective complaints could be rejected); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir.2001) (finding the fact that a physician's diagnosis was based largely upon claimant's self-reported symptoms allowed the ALJ to assign that physician's opinion lesser weight).

> The ALJ's RFC finding was as follows:
>
> [T]he claimant retains the residual functional capacity to perform "medium" work not requiring her to sit for more than 3 out of 6 hours, stand for more than 3 out of 7 hours, or walk for more than 2 out of 6 hours, not requiring her to climb, balance or crawl on more than an occasional basis, and not requiring her to be around dangerous machinery or unprotected heights.

(Tr. 48). In making the finding, the ALJ expressly considered the opinion of the State agency physicians who reviewed the plaintiff's medical records (Tr. 47; *see* Tr. 285-92, 328-35). The State agency physicians had limited the plaintiff to light work (lifting no more than 20 pounds) that did not require more than occasional climbing of ramps or stairs, or more than occasional balancing, stooping, kneeling, crouching, or crawling; did not require any climbing of ladders, ropes and scaffolds; and did not require even moderate exposure to hazards (Tr. 285-92, 328-35).

The ALJ noted that there was no evidence in the record that the plaintiff was limited to lifting 20 pounds (Tr. 47). The ALJ further noted that he had considered additional medical evidence that was unavailable to the State agency physicians (*id.*). As argued by the Commissioner, the plaintiff did not allege in her testimony she had any lifting restrictions, and none of her physicians noted she had any lifting restrictions. In determining a plaintiff's RFC, an ALJ may consider the absence of limitations imposed by

treating or examining physicians. *See Lee v. Sullivan*, 945 F.2d 687, 692 (4th Cir. 1991). This court finds no error in the ALJ's rejection of the State agency physicians' opinions of the plaintiff's lifting restrictions.

The plaintiff further argues that the ALJ's RFC assessment does not contain all of the postural limitations suggested by the State agency physicians (pl. brief at 20, 25). Specifically, the plaintiff argues that the ALJ should have included the State agency limitations on stooping, kneeling, and crouching in the RFC finding (pl. brief at 25). While the ALJ stated his reasons for rejecting the State agency physicians' opinions as to the plaintiff's lifting restrictions, he did not state his reasons for apparently rejecting the postural limitations (*see* Tr. 47). The Commissioner argues that even assuming error, the error was harmless. The Commissioner contends that the job of laundry worker II requires only occasional stooping, but no crouching or kneeling, and even if the ALJ had included in the plaintiff's RFC the postural limitations found by the State agency physicians, the vocational expert would have testified that a hypothetical person with that RFC could perform the laundry worker II job, and the ALJ would have found the plaintiff not disabled. As will be discussed below, the undersigned recommends that this matter be remanded to the ALJ for further testimony from the vocational expert. This court finds that the ALJ should have explained his reasons for rejecting the limitations on stooping, kneeling, and crouching, and that if these limitations were not rejected they should have been included in the RFC finding and the hypothetical to the vocational expert.

The plaintiff also claims that the ALJ erred by not including manipulative limitations in the RFC. She argues that "the medical record reasonably supported some type of manipulative limitations" (pl. brief at 27). As argued by the Commissioner, the plaintiff is attempting to shift the burden of proof. The issue is not, as she puts it, whether evidence supports her position. Rather, the issue is whether substantial evidence in the record supports the ALJ's conclusions. It is not "the court's function to substitute its

17

judgment for that of the [Commissioner] if his decision is supported by substantial evidence." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Here, substantial evidence supports the ALJ's conclusions. As the ALJ noted, the plaintiff received significant relief with pain medication (Tr. 46; *see* Tr. 235-36). Further, as noted above, the ALJ properly found the plaintiff's complaints were not credible (Tr. 46). Moreover, there is nothing in the medical evidence supporting a finding that the plaintiff had manipulative limitations. Indeed, the plaintiff did not allege she had manipulative limitations attributed to arthritis in her reports to the Commissioner or when she testified, other than to claim that she had "difficulty with small buttons and zippers" (Tr. 8-27, 128-38, 152-59, 172-80, 184-90). Consequently, the ALJ reasonably found the plaintiff retained an RFC for a range of medium work that did not include manipulative limitations (Tr. 48).

Based upon the foregoing, upon remand, the ALJ should be instructed to explain his reasons for rejecting the State agency physicians' limitations on stooping, kneeling, and crouching. If these limitations were not rejected, they should be included in the RFC finding, and the ALJ should include such limitations in the hypothetical to the vocational expert at the fifth step of the sequential evaluation process. The plaintiff's other allegations of error with regard to the RFC finding are without merit as set forth above.

***Vocational Expert***

The plaintiff further argues that the vocational testimony at the hearing contradicts the *DOT*. "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

> Social Security Ruling 00-4p provides in pertinent part:
>
> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *3.

> The ALJ asked the vocational expert to consider the following hypothetical:
>
> I want you to assume that the individual can perform medium work, that is to say 50 pounds occasionally, 25 pounds frequently, could sit for 3 hours, out of 6, stand for 3 hours out of 7, walk for 2 hours out of 6, would be able to only occasionally claim and balance and crawl, would not, should not be working around machinery or unprotected . . . heights.

(Tr. 30). The vocational expert testified that a person with the same RFC as the plaintiff could perform the jobs of packer and laundry worker II, as described in the *DOT* (Tr. 30-31). Earlier in the hearing, the ALJ had asked the vocational expert to tell him if there were any conflicts between her testimony and the *DOT* (Tr. 28). The vocational expert did not identify any conflicts.

It is unclear why the ALJ broke the restrictions down into six- and seven-hour segments of time rather than an eight-hour workday. As argued by the plaintiff, the only reasonable way to interpret the ALJ's findings is to assume the ALJ intended to restrict the plaintiff to sitting three hours in a workday, standing three hours in a work day, and walking two hours in a workday. Otherwise, the intent of the ALJ as to how much the plaintiff could do in a particular workday is entirely speculative (pl. brief at 16 n.2). The Commissioner has stated that medium work requires the ability to stand or walk "approximately six hours in an

19

eight-hour workday." SSR 83-10, 1983 WL 31251, at *6. The Commissioner argues that there is no error because the ALJ found the plaintiff had the RFC to walk or stand five hours in a workday, and this "is approximately the amount of time required for medium work" (def. brief at 14). This court finds that the ALJ erred in failing to obtain testimony from the vocational expert on this issue because of the apparent conflict between the vocational expert's testimony and the walking and standing requirements for medium work. On remand, the ALJ should be instructed to obtain testimony from the vocational expert explaining the conflict.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/Kevin F. McDonald
United States Magistrate Judge

May 12, 2011

Greenville, South Carolina